Goetz Fitzpatrick LLP
One Penn Plaza, 31st Floor
New York, New York 10119
Telephone: 212-695-8100
Fax: 212-629-4013
By: Gary M. Kushner, Esq.
Scott D. Simon, Esq.
*Proposed Attorneys for Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PIERSON LAKES HOMEOWNERS ASSOCIATION, INC., | : | Case No. 18-22463-rdd |
| | : | |
| Debtor. | : | |
| | : | |

-----------------------------------------------------------------X

**DEBTOR'S MOTION FOR EMERGENCY USE OF CASH COLLATERAL
AND FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING USE OF CASH
COLLATERAL, (2) GRANTING ADEQUATE PROTECTION TO PRE-PETITION
SECURED LENDERS, (3) SCHEDULING INTERIM AND FINAL HEARINGS
ON THE USE OF CASH COLLATERAL AND (4) GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE

Pursuant to Sections 105, 361 and 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Pierson Lakes Homeowners Association, Inc., the above-captioned debtor and debtor-in-possession (the "Debtor" or "PLHA"), hereby moves this Court for an Order granting the emergency use of cash collateral pending the entry of interim and final Orders authorizing the use of cash ("Cash Collateral") in which Banco Popular ("Bank") has an interest.

In support of the Motion, the Debtor respectfully states as follows:

1

## I. PRELIMINARY STATEMENT

1. The Debtor requires the immediate use of Cash Collateral in order to pay certain operating expenses and maintain the value of its property. Specifically, the Debtor requests.

   a. entry of an Order substantially in the form attached hereto as Exhibit "A" authorizing the emergency use of up to $44,000 of Cash Collateral in accordance with the Emergency Budget (the "Budget") attached hereto as Exhibit "B" in order to avoid immediate and irreparable harm to the Debtor's estate;

   b. entry of interim and final Orders authorizing use of Cash Collateral in the ordinary course of business and granting the Bank a replacement lien to secure any diminution in the value of the Bank's collateral' and

   c. the scheduling of interim and final hearings with respect to the relief requested herein.

2. The Debtor's use of Cash Collateral is necessary to pay its usual and ordinary operating expenses while the Debtor reorganizes its business operations. Absent the use of Cash Collateral to pay the expenses in the annexed Budget (the "Budget"), the Debtor will be unable to operate and the value of the Debtor's assets will be eradicated.

3. The payment of the expenses in the Budget will therefore benefit the holders of liens on the Debtor's assets in particular, and the Debtor's other creditors in general, by preserving the value of the Debtor's estate.

## II. JURISDICTION AND VENUE

4. The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

5. This is a core proceeding under 28 U.S.C. §§ 157(b).

6. Venue is proper before the Court under 28 U.S.C. §§ 1408 and 1409

## III. BACKGROUND

7. On March 27, 2018 (the "Petition Date"), the Debtor filed a voluntary petition under

chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

8. The Debtor is now operating as a debtor-in-possession under Sections 1107 and 1108 of the Bankruptcy Code. The Office of the United States Trustee has not appointed an Official Committee of Unsecured Creditors.

9. The Pierson Lakes Development (the "Development") is an exclusive residential development located in Sloatsburg, New York in the town of Ramapo. The Development is a gated community of approximately 1,064 acres that contains two lakes of approximately 100 acres each and wooded nature areas.

10. The Development is divided into three phases (hereinafter referred to as "Phase I," "Phase II," and "Phase III"). The Development was originally owned by Ramapo Land Company, Inc., which recorded the Development's declaration in the Rockland County Clerk's Office in May 1990. It was sold in 2001 to the present sponsors, Pierson Project, LLC, Potake Lake, LLC, and Rock Hill LLC d/b/a Rock Hill Project (collectively, the "Sponsors").

11. From 2002 through approximately 2006, the Sponsors built high-end, luxury estate homes in "Phase I" of the project. Phase I is comprised of 25 lots. Two additional lots are physically located outside of the geographic boundary of Phase I and obtain services for which they pay monthly dues.

12. Phases II and III of the Development are presently owned by the Sponsors, and consist of 49 approved undeveloped lots. The Sponsors also own one lot (lot 12) situated in Phase I of the Development. Phases II and III consist of vacant land, without necessary infrastructure items such as finished roads, sewers or utilities.

13. The PLHA is a not-for-profit corporation that manages the entire Development. The affairs of the PLHA are governed by a board of directors consisting of no fewer than three, nor more than seven members, each of whom must be a member of the PLHA. Presently, the board consists of five (5) members, four (4) of which are homeowners and one (1) of which is appointed by the Sponsors. Purchasers of lots have one membership interest in the PLHA for all purposes per each lot owned. However, in accordance with the New York State Not-For-Profit Corporation Law, in no event may more than one vote per member be cast at any vote of the PLHA.

14. The PLHA owns, operates and maintains the common areas of the Development and the facilities located thereon. The common areas include but are not limited to the security gatehouse and guardhouse, the boathouse, private roadways, the fire protection system, hiking trails, bridle paths, certain septic tanks, the common storm and solid waste disposal systems, lakes, greenbelt and wooded areas and landscaped areas. The common areas owned by the PLHA have minimal value compared with the lots themselves.

15. The day-to-day management of the Development is handled by a professional management company with whom the PLHA has contracted. The management company contracts with various service providers to maintain, repair and improve the common areas of the Development. Homeowners are responsible for the payment of a *pro rata* portion of the PLHA's expenses arising from the operation and maintenance of the common areas, including the cost of the services rendered by the management company.

16. The PLHA establishes an annual budget to address the expected costs of maintaining the Development. The approved budget is funded by the payment of monthly dues collected from the lot owners. The PLHA also has the limited right to make special assessments which are likewise funded by lot owners.

17. When the Sponsors became involved with the Development in 2001, the PLHA was negotiating the settlement of a lawsuit it had brought against Ramapo Land Co., primarily associated with repair of the infrastructure situated in the Development. Through the course of the lawsuit and the Sponsors' entry into the project, the Sponsors entered into several settlement agreements with the PLHA and Ramapo Land Co. These included agreements entered into in 2001 (the "2001 Agreement"), 2002 (the "2002 Agreement"), 2004 (the "2004 Agreement") and 2011 (the "2011 Agreement"). These settlement agreements ultimately became the subject of extensive litigation between the Sponsors and the PLHA, described in more detail below.

18. Of relevance here, the 2001 Agreement expressly stated that "the [PLHA] or its Board of Directors may not without written consent of the [Sponsors] take any action which will hinder and/or adversely impact the ability of the [Sponsors] to market or sell the Lots or Homes constructed on such Lots." This provision was incorporated by reference into the 2011 Agreement.

19. In August 2004, the Sponsors submitted their first plat plans for Phases II and III, which certain members of the PLHA opposed. The Sponsors withdrew the plans and became delinquent in the payment of dues associated with the Sponsors' lots. In late 2006 or early 2007, the PLHA filed a lawsuit seeking to foreclose upon an approximately $250,000 lien that it had filed for unpaid maintenance dues against the Sponsors' lots in Phases II and III.

20. In 2009, the planning board approved the Sponsors' proposed resubmitted subdivision plan for Phase II and Phase III. In late 2010, while the 2007 lawsuit was still pending, an Article 78 proceeding was commenced by the PLHA against the Sponsors. In the Article 78 proceeding, the PLHA sought to overturn the local planning board's approval of the Sponsors' preliminary subdivision application for Phases II and III. The Article 78 proceeding was decided

in the Sponsors' favor. At that point, the PLHA and the Sponsors began to negotiate the 2011 Agreement, which was executed by the parties in April 2011.

21.  The 2011 Agreement (1) specified how the PLHA's budget would be set; (2) incorporated the 2001 Agreement; (3) specified the responsibilities of the Sponsors and the PLHA for Phase I road work; (4) required that the Sponsors use their best efforts in obtaining all necessary approvals for the Development while acknowledging that the method for obtaining these approvals was within the sole discretion of the Sponsors; (5) defined "Final Approval" upon which the PLHA's budget structure changed to include the Sponsors' payment of new costs associated with services for Phases II and III; (6) confirmed the provision in the declaration prohibiting blanket liens; (7) contained a dispute resolution mechanism that included expedited arbitration to resolve disputes regarding, among other things, the payment of additional funds; and (8) provided that in the event of future legal proceedings the prevailing party is entitled to receive costs and fees. The 2011 Agreement also addressed the application process with respect to the Sponsors' construction of a new guardhouse, new entrance/exit gates and related roadway modifications for the Development.

22.  A dispute arose in October 2013 when the Sponsors failed to resume the payment of dues when, as believed by the PLHA, the Sponsors had obtained "Final Approval" of the subdivision. The Sponsors advised the PLHA that (1) they did not construe final subdivision approval granted by the municipality to constitute "Final Approval" as defined in the 2011 Agreement and would therefore not be resuming the crucial monthly payments to the PLHA that the Sponsors had avoided since 2007, and (2) the Sponsors had not submitted in May 2012, as required by the 2011 Agreement, a municipal approval for certain security improvements that the

Sponsors were suddenly contending needed to be obtained before such maintenance payments would commence.

23. Having been assured for a year and a half on numerous occasions orally and in writing by the Sponsors that Final Approval was pending and imminent, the PLHA was stunned by this event and had no choice but to declare Sponsors in breach of the 2011 Agreement. From the PLHA's perspective, the terms of the 2011 Agreement were unequivocally clear that each of the applications had to be made simultaneously and that the Sponsors' receipt of the right to "commence construction of roads and infrastructure or Phases II and III of the Pierson Lakes Development" did indeed constitute "Final Approval" – thus, triggering the Sponsor's obligation to resume the payment of dues.

24. The dispute between the Sponsors and the PLHA escalated in late 2013, when Chris Harrison ("Harrison"), a resident of Phase I and a practicing attorney, began advising the PLHA as to its dealings with the Sponsors and the alleged breach of the 2011 Agreement. In short, Harrison advised the PLHA to take aggressive measures against the Sponsors, including Harrison's direct contact with the Attorney General of the State of New York in which he questioned the accuracy of the Sponsors' offering plan. Harrison also counseled the PLHA to file a blanket lien against the Sponsors' lots.

25. From the Sponsors' perspective, as a result of Harrison's advice, the PLHA breached the 2011 Agreement by hindering the Sponsors' ability to market and sell the lots located in Phases II and III – which the PLHA promised not to do in the 2001 Agreement (as stated above). The Sponsors alleged, *inter alia*, they had suffered delay damages as a result of the PLHA's conduct.

26. In connection with their respective disputes, the Sponsors and the PLHA went to arbitration before the Honorable Ira A. Warshawsky of National Arbitration and Mediation (the "Arbitrator"). The Arbitrator entered four separate written decisions dated August 8, 2016; December 31, 2016; May 12, 2017; and May 26, 2017 (each an "Arbitration Award" and, collectively, the "Arbitration Awards").

27. The Arbitration Award, dated April 8, 2016, imposed liability on both the Sponsors and the PLHA as to various aspects of their respective claims. The Arbitration Award, dated December 31, 2016, set the amount of damages to which each party was entitled, with a final net award of $1,484,331.10 granted in favor of the Sponsors.[1] The Arbitration Award, dated May 12, 2017, awarded the Sponsors legal fees and costs in the amount of $608,278, and stenographer's fees associated with the arbitration proceedings in the amount of $5,113.

28. The Arbitration Award, dated May 26, 2017, represented a supplemental award by the Arbitrator that clarified a dispute between the Sponsors and the PLHA as to whether payment of the damages award was a responsibility placed entirely on the Phase I owners. The PLHA further sought clarification that none of the Phase I lot owners would be personally liable for a judgment that the Sponsors were seeking to impose upon the Phase I homeowners. In connection with the parties' request for the Arbitrator to clarify the damages award, the Sponsors sought, *inter alia*, clarification as to whether (1) Lot 12 on Phase I, which is owned by the Sponsors, and/or (2) the 49 lots situated in Phases II and III, were responsible for contributing to the payment of the Arbitration Award.

---

[1] In his rulings, the Arbitrator cited the conduct charted by Harrison as the primary cause of the Sponsors' damages. Harrison coerced the board of directors for the PLHA, as it existed in 2013, to provide him with an indemnification agreement which shielded him from any claims arising from his advice. The 2013 board has been reconstituted. The present board of the PLHA is investigating whether there are viable claims against Harrison notwithstanding the indemnity.

29. The Arbitration Award, dated May 26, 2017, resolved these issues by holding that the Phase I homeowners do not have joint and several liability for the payment of the Sponsors' damages. Rather, the PLHA is solely responsible for paying these damages to the Sponsors. The Arbitrator further held that the Sponsors were exempt from paying any portion of the Arbitration Awards.

30. On July 5, 2017, the Sponsors filed a petition in the Supreme Court of the State of New York, County of Rockland (the "State Court"), bearing index number 032944/2017, to confirm the Arbitration Awards (the "Petition to Confirm"). On or about August 5, 2017, the PLHA filed a cross-petition seeking to vacate the Arbitration Awards (the "Cross-Petition to Vacate").

31. By Decision and Order of the State Court (Hon. Rolf M. Thorsen), dated February 7, 2018, and entered in the Rockland County Clerk's office on February 8, 2018, the Petition was granted confirming the Arbitration Awards and denying the Cross Petition to Vacate (the "Confirmation Ruling").

32. Immediately after the Confirmation Ruling, the Sponsors submitted a proposed form of judgment providing, among other things, for a money judgment in the amount of $2,148,514.67 against the PLHA, plus interest at the rate of nine percent (9%) per annum accruing from and after May 26, 2017, the date of the final Arbitration Awards, to the date of entry of the judgment.

33. The PLHA filed a proposed counter-judgment in the State Court seeking to challenge various aspects of the Sponsors' proposed judgment. The State Court had not entered any judgment as of the Petition Date.

34. The PLHA has sought the protection of the Bankruptcy Court in order to preserve its ability to manage the Development. Should the State Court enter the Sponsors' form of judgment, the Sponsors will seek to levy on the PLHA's operating and reserve bank accounts. These accounts contain the funds that allow the PLHA to maintain and safeguard the Development's common areas. The PLHA is responsible for life safety services like fire protection, septic tanks and waste disposal. If the PLHA is unable to access its funds to provide these services, the development's residents will be put at risk.

35. Following the entry of the Arbitration Awards, the PLHA reached out to the Sponsors' counsel in an attempt to negotiate a settlement that included a forbearance agreement. The PLHA's proposal was rejected by the Sponsors, and there was no forbearance offered. As a result, the PLHA's ability to provide essential services to residents was put in peril.

36. The PLHA is limited in its ability to raise association dues and assess homeowners for the PLHA's judgment debt. The chapter 11 will provide the Debtor with a breathing spell to craft a plan of reorganization that accounts for the Sponsors' judgment without hamstringing the PLHA's ability to maintain the Development and secure the wellbeing of the homeowners who depend on those services.

## IV. SECURED CLAIM AGAINST THE DEBTOR – LOANS WITH BANCO POPULAR

37. On or about October 1, 2013, the Debtor obtained a credit facility in the original amount of $650,000 from Banco Popular North America (the "First Loan").

38. The proceeds of the First Loan were received by the Debtor and used to fund various road improvements at the Development.

39. In consideration for the First Loan, the Debtor granted the Bank a first-priority security interest in various assets of the Debtor, including the assessments to be levied against lot

owners in the Development, all accounts, and all other receivables due to the Debtor from any other sources (the "Cash Collateral").

40. It appears from the records made available to the Debtor that the Bank properly filed a UCC Financing Statement evidencing and perfecting its lien on Cash Collateral in connection with the First Loan.

41. In late December 2015, the Debtor obtained a second loan from the Bank in the principal amount of $250,000 for the intended purpose of financing the Debtor's arbitration against the Sponsors (the "Second Loan").

42. It further appears from the records made available to the Debtor that the Bank properly filed a UCC Financing Statement evidencing and perfecting its lien on Cash Collateral in connection with the Second Loan.

43. The Debtor is current on its repayment obligations to the Bank in connection with both the First Loan and the Second Loan. At present, there is an approximate balance due to the Bank in the amount of $206,227.77 on the First Loan and $232,430.42 on the Second Loan.

### IV. REQUESTED USE OF CASH COLLATERAL AND OFFER OF ADEQUATE PROTECTION

**A. Use of Cash Collateral**

44. The Debtor requires the immediate use of Cash Collateral in order to avoid immediate and irreparable harm to its business. Absent the emergency use of Cash Collateral to pay the usual and ordinary expenses of the business, the value of the Development will be irreparably harmed.

45. The immediate use of Cash Collateral is therefore necessary to preserve the value of the Debtor's bankruptcy estate.

46. The Debtor requests the immediate authority to utilize Cash Collateral in the

amount of up to $44,000 to pay the actual expenses incurred in accordance with the Budget.

47. As reflected in the Budget, the Debtor's expenses primarily include the expenses of operating the Development, including general repairs and maintenance, security services, trash removal, and monitoring of the Development's fire safety and security systems. Without these essential services, homeowners in the Development would be put at risk.

48. The Debtor requests the use of Cash Collateral as set forth on the Budget through the date of the interim hearing on the instant Motion to fund its operations to the extent necessary to avoid immediate and irreparable harm to the Debtor's business.

49. Approval of the use of Cash Collateral on the terms identified in this Motion is in the best interests of the Debtor, the Debtor's estate and its creditors. The use of Cash Collateral will enable the Debtor to operate, pay post-petition obligations, and pay vendors in order to preserve the value of the Development.

50. Absent the use of Cash Collateral, the Debtor would be unable to provide basic services to the lot owners.

51. The Debtor's proposed counsel contacted the Bank, through the loan officer who worked with the Debtor on the First Loan and Second Loan, on March 26, 2018, the day before the Petition Date, in an attempt to discuss the instant request. Specifically, counsel asked the loan officer to put Debtor's counsel in touch with the attorneys who will be representing the Bank in this chapter 11 proceeding. At the time the petition was filed, the Bank had not provided the requested contact information.

52. It remains the Debtor's desire to obtain the consent of the Bank prior to the interim hearing. However, pending a consensual arrangement, the Debtor seeks Court approval to use Cash Collateral in accordance with the Budget.

**B. Adequate Protection**

53. Section 363(e) of the Bankruptcy Code provides that a party with an interest in property proposed to he used, sold or leased by the debtor may receive adequate protection of such interest before a debtor may use, sell or lease such property. 11 U.S.C. § 363(e).

54. The Debtor proposes to provide adequate protection to the Bank by the granting of post-petition liens (the "Replacement Liens") on post-petition collateral (the "Post-Petition Collateral") in exchange for use of the Bank's Cash Collateral, to the extent of the diminution in the value of its collateral.

55. The Debtor believes that the Bank is the holder of a first priority, validly perfected lien on Cash Collateral. The liability to the Bank on its secured claim is fully secured by all of the property against which the Bank has a valid lien and security interest. The Debtor's operating and reserve accounts are <u>fully</u> encumbered by the Bank's pre-petition lien. The Debtor has a contractual right to collect annual maintenance from lot owners, as well as a limited right to assess lot owners for special expenses. Therefore, by this Motion, the Debtor considers it necessary to limit the Replacement Lien to protect the Bank's interest in Cash Collateral.

56. The Replacement Lien shall be subordinate to the payment of U.S. Trustee fees in the Debtor's case and a carve-out for the Debtor's professionals in an amount to be established prior to the interim hearing. (This professional fee carve-out is not included in the Budget, and therefore is not included in the proposed Order authorizing emergency use of Cash Collateral.)

57. Moreover, the Replacement Liens shall not extend to the recovery of funds or proceeds from the successful prosecution of avoidance actions under Sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code.

58. Section 361 of the Bankruptcy Code provides that when adequate protection is required

under Section 363 of the Bankruptcy Code, such adequate protection may be provided by, *inter alia,* "providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(2).

59. What constitutes adequate protection varies with the facts and circumstances of each particular case. Bankruptcy courts are vested with discretion to determine the form of protection that best reflects the spirit and intent of Section 361. *See In re Bramham,* 38 B.R. 459, 466 (Bankr. D. Nev. 1984); *In re Lackow Brothers, Inc.,* 10 B.R. 717, 720 (Bankr. S.D. Fla. 1981); *In re Family Investments, Inc.,* 8 B.R. 572 (Bankr. W.D. Ky. 1981). Regardless of its form, the entitlement to and measure of the protection required is always determined by the extent of the anticipated or actual decrease, if any, in the value of the secured creditor's collateral during course of the bankruptcy case. *See In re First South Savings Assoc.,* 820 F.2d 700, 710 (5th Cir.1987).

60. Adequate protection requires only that the value of the creditor's interest in the cash collateral be protected from diminution while the Debtor uses the cash collateral. *United Savings Association of Texas v. Timbers of Inwood Forest Assoc., Ltd*, 484 U.S. 365 (1988). Said another way, it is "intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate." *In re Markos Gurnee Partnership*, 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997).

53. The value of the Bank's secured position will be adequately protected during the Debtor's use of Cash Collateral by the preservation of the value of the Debtor's assets and the issuance of the Replacement Liens as set forth above. *In re Kain,* 86 B.R. 506, 513 (Bankr. W.D. Mich. 1998)

**C. The Court Should Approve Interim Use of Cash Collateral**

54. Bankruptcy Rule 4001 provides, among other things, that a final hearing on the Debtor's request to use Cash Collateral may not be commenced earlier than 14 days after the service of the Motion. However, the Court may conduct a preliminary expedited hearing on the Motion upon request by the Debtor, and may authorize the use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate.

55. The Debtor requests that the Court immediately schedule and conduct a preliminary hearing on the Motion and authorize the Debtor to utilize Cash Collateral in the amount(s) set forth in a subsequent Budget to be agreed upon with Unity during the period after the entry of the interim Order until the final hearing on the Motion.

56. For the foregoing reasons, the Debtor's proposed use of Cash Collateral is warranted.

57. No prior request for the relief requested in this Motion has been made by the Debtor to this or any other Court.

### V. NOTICE

58. Notice of this Motion has been provided by facsimile, electronic mail, overnight delivery, or hand delivery to: (i) the Office of the United States Trustee, (ii) the Debtor's 20 largest unsecured creditors, (iii) the Bank; (iv) taxing authorities and (v) all parties who have filed a notice of appearance and request for notices in this proceeding.

59. The Debtor submits that such notice is good and sufficient notice of the relief requested herein under the circumstances.

60. The Debtor further requests that the Court schedule the interim and final hearing on the Motion and authorize the Debtor to mail copies of the signed Order, which fixes the time,

date and manner for filing objections to the Motion, to the foregoing parties and counsel to any committee appointed in this case. The Debtor requests that the Court consider such notice of the interim and final hearings as good and sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order:

A. Approving the notice of this Motion as described above;

B. Authorizing the Debtor to use Cash Collateral on an emergency basis during the period from the entry of the Order attached hereto as Exhibit "A," and on a continuing basis during the interim period from entry date of the interim Order granting use of Cash Collateral through and including the date of the hearing on a final Order granting the Debtor continued use of Cash Collateral;

C. Granting adequate protection to the Bank in accordance with the terms of this Motion;

D. Scheduling interim and final hearings on the Motion; and

E. Granting such other relief as is just and proper.

Dated: New York, New York
March 27, 2018

                        GOETZ FITZPATRICK LLP
                        *Proposed Attorneys for Debtor*

By: /s/Gary M. Kushner
     Gary M. Kushner
     A Partner of the Firm
     Scott D. Simon
     One Penn Plaza, 31st Floor
     New York, New York 10119
     (212) 695-8100

t:\scottdsimon\pierson lakes\motion to use cash collateral\emergency motion to use cash collateral.docx