Goetz Fitzpatrick LLP
One Penn Plaza, 31st Floor
New York, New York 10119
Telephone: 212-695-8100
Fax: 212-629-4013
By:    Gary M. Kushner, Esq.
         Scott D. Simon, Esq.

***Attorneys for Debtor***

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                                    :
In re:                                                            :                Chapter 11
                                                                    :
PIERSON LAKES HOMEOWNERS              :                Case No. 18-22463-rdd
ASSOCIATION, INC.,                               :
                                                                    :
                                        Debtor.            :
                                                                    :
-------------------------------------------------------------X

## DEBTOR'S PLAN OF REORGANIZATION

The following chapter 11 plan of reorganization (the "Plan") is hereby proposed and filed

by Pierson Lakes Homeowners Association, Inc. ("PLHA" or "Debtor"), the debtor and debtor-

in-possession, by its attorneys, Goetz Fitzpatrick LLP, under Chapter 11 of Title 11 of the United

States Code.

# ARTICLE I

## SUMMARY AND DEFINITIONS UNDER THE PLAN

The formulation and confirmation of a plan of reorganization or liquidation is the principal purpose of a chapter 11 case. A plan sets forth the means of satisfying or discharging the claims against or interests in a chapter 11 debtor. Chapter 11 does not require that each holder of a claim against a debtor vote in favor of a plan in order for the Bankruptcy Court to approve a plan. If any class of claimants is impaired by a plan, the plan must be accepted by at least one "impaired" class of claims or interests. A claim or interest is deemed impaired if the plan provides that the claimant: (i) will not be repaid in full; (ii) will have any of its legal rights altered; or (iii) has an interest that is adversely affected. The holder of an impaired claim or interest is entitled to vote to accept or reject the plan if the claim or interest has been allowed under § 502 of the Bankruptcy Code, or temporarily allowed for voting purposes under Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

In order for a plan of reorganization to be confirmed, it must be accepted by creditors who hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in each impaired class of claims voting on the plan. In the event that a plan is rejected by a class of voting creditors, the Court may nevertheless confirm the plan under the "cram down" procedure detailed in § 1129(b) of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code permits confirmation of a plan of reorganization, notwithstanding rejection by one or more classes of claimants if: (i) at least one impaired class has accepted the plan; (ii) claimants receive more under the plan than they would upon liquidation of the debtor's remaining assets under chapter 7 of the Bankruptcy Code; (iii) the absolute priority rule established by the Bankruptcy Code is met; and (iv) the Court finds

that the plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class or classes. This procedure is generally referred to as "cram-down."

Here, the Debtor's proposed Plan will pay 100% of the allowed claims of all creditors. Unsecured creditors in Class 3 of the Plan will be paid, in full, upon the Effective Date of the Plan. Consequently, Class 3 will not be paid interest under the Plan. The unsecured claim in Class 4 of the Plan is being paid 100% of the Allowed Claim over a period of years. Therefore, the Class 4 claimant will be paid interest on its Allowed Claim. Given that all claims will be paid, in full (with interest when required), no Class under the Plan is impaired. No voting for or against the Plan is necessary.

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan, and they are supplemented by the following definitions. For purposes of the Plan, the following terms shall have the respective meanings hereinafter set forth (such meanings to be equally applicable to the singular and plural forms of the terms defined), unless a different meaning is clearly required by and explained in the text. All capitalized terms not defined herein shall have the same meaning ascribed to such term as appears in the Disclosure Statement.

**"Administrative Expense Claim"** shall mean any claim for cost or expense of administration of the Chapter 11 Case entitled to priority in accordance with the provisions of §§ 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation: (i) any actual, necessary costs and expenses of preserving the Debtor's estate and of operating the Debtor's business (other than such Claims or portions thereof which, by their express terms, are not due or payable by the Effective Date); (ii) all allowances of compensation for legal or other services or reimbursement of costs and expenses under §§ 330 or 503 of the Bankruptcy Code or otherwise

allowed by the Bankruptcy Court; and (iii) all fees or charges assessed against the Debtor's estates under Chapter 123 of Title 28, United States Code.

**"Allowed Administrative Claim"** shall mean all or that portion of any Administrative Expense that has been allowed by a Final Order of the Bankruptcy Court or for which no objection is filed prior to the final date permitted for the filing of such objection set forth in the Plan, Confirmation Order or such other applicable period of limitation fixed by the Bankruptcy Code or the Bankruptcy Rules.

**"Allowed Claim"** shall mean a Claim, other than an Administrative Expense, Disputed Claim or an Interest, which is: (i) listed in the Debtor's Schedules (including any amendments thereto), filed in the Chapter 11 Case as of the Effective Date, and not listed therein as disputed, contingent, unliquidated or unknown and as to which no objection to the allowance thereof is filed prior to the final date permitted for the filing of such objection set forth in the Plan, Confirmation Order or such other applicable period of limitation fixed by the Bankruptcy Code or the Bankruptcy Rules; (ii) set forth in a Proof of Claim timely and properly filed in the Chapter 11 Case on or before the date fixed by the Bankruptcy Court (or by applicable rule or statute) as the last day for filing such Proof of Claim, or late-filed with leave of the Bankruptcy Court after notice and opportunity to be heard given to counsel for the Debtor, and as to which no objection to the allowance thereof is filed prior to the final date permitted for the filing of such objection set forth in the Plan, Confirmation Order or such other applicable period of limitation fixed by the Bankruptcy Code or the Bankruptcy Rules; or (iii) determined to be allowed by a Final Order of the Bankruptcy Court. Except as otherwise specified in this Plan or a Final Order, an Allowed Claim shall not include unpaid interest on such Claim from and after the Petition Date.

"**Allowed Class 1 Claim**" shall mean the Allowed Claim of Popular Bank (First Loan).

"**Allowed Class 2 Claim**" shall mean the Allowed Claim of Popular Bank (Second Loan).

"**Allowed Class 3 Claim**" shall mean the Allowed Claims of General Unsecured Convenience Claimants.

"**Allowed Class 4 Claim**" shall mean the Allowed Claim of the Sponsors.

"**Allowed Priority Tax Claim**" shall mean any Allowed Claim or portion thereof entitled to priority in payment under § 507(a)(8) of the Bankruptcy Code.

"**Allowed Secured Claim**" shall mean that portion of an Allowed Claim which is secured by a valid perfected lien on property of the Debtor, to the extent of the value of the interest of the holder of such Allowed Secured Claim in the property of the Debtor as determined by the Bankruptcy Court pursuant to § 506(a) of the Bankruptcy Code, together with such interest (including interest accrued on or after the Petition Date), fees, costs and charges as may be allowed by the Bankruptcy Court under § 506(b) of the Bankruptcy Code.

"**Allowed Unsecured Claim**" shall mean any Allowed Claim, or portion thereof, that is not an Allowed Administrative Expense, a Priority Claim, an Allowed Secured Claim or an Allowed Priority Tax Claim.

"**Arbitration Awards**" shall mean, collectively, the four separate written decisions of Honorable Ira B. Warshawsky of National Arbitration and Mediation dated August 8, 2016; December 31, 2016; May 12, 2017; and May 26, 2017.

"**Avoidance Actions**" shall mean any and all Causes of Action that may exist under sections 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under similar state laws.

**"Bankruptcy Code"** shall mean the Bankruptcy Reform Act of 1978, as amended, and as codified in Title 11 of the United States Code.

**"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Southern District of New York, Westchester Division, having jurisdiction over the Chapter 11 Case and, to the extent of any reference made pursuant to 28 U.S.C. Section 158, the unit of such District Court constituted pursuant to 28 U.S.C. Section 151.

**"Bankruptcy Rules"** shall mean the rules and forms of practice and procedure in bankruptcy, promulgated under 28 U.S.C. Section 2075 and also referred to as the Federal Rules of Bankruptcy Procedure.

**"Bar Date"** shall mean June 28, 2018, the last date for filing pre-petition claims in the Debtor's chapter 11 case.

**"Bar Date Order"** shall mean the order of the Bankruptcy Court setting June 28, 2018 as the last date for the filing of pre-petition claims in the Debtor's chapter 11 case [ECF No. 28].[1]

**"Business Day"** means and refers to any day except Saturday, Sunday, and any other day on which commercial banks in New York are authorized by law to close.

**"Cash"** shall mean cash and cash equivalents, and other readily marketable securities or instruments including, but not limited to, bank deposits, checks and other similar items.

**"Cash Collateral"** has the meaning ascribed to such term in sections 363(a) and 363(c)(2) of the Bankruptcy Code.

**"Causes of Action"** shall mean any and all claims, suits, actions and causes of action of the Debtor or the Debtor's estate, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured,

---

[1] "ECF" refers to the Bankruptcy Court's electronic filing system.

disputed or undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law equity or otherwise, including, without limitation, the Avoidance Actions.

**"Chapter 11"** shall mean chapter 11 of the Bankruptcy Code.

**"Chapter 11 Case"** shall mean this case under Chapter 11 filed by the Debtor on the Petition Date.

**"Claim"** shall mean a claim against the Debtor, as defined in § 101(5) of the Bankruptcy Code, whether or not asserted.

**"Claimant"** shall mean the holder of a Claim.

**"Claims Motion"** shall mean any motion filed by the Debtor seeking to reduce, expunge or reclassify certain claims to conform to the Debtor's books and records or for such other reasons as the Debtor shall state in such motion.

**"Class"** shall mean any class into which Allowed Claims and Allowed Interests are classified under Article IV of the Plan.

**"Collateral"** shall mean any of the Debtor's assets that are subject to valid, perfected and enforceable security interests, including furniture, fixtures, equipment, tax refunds, accounts receivable and inventory.

**"Confirmation Date"** shall mean the date the Confirmation Order is entered by the Bankruptcy Court.

**"Confirmation Hearing"** shall mean the hearing on confirmation of the Plan before Judge Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, at which the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interest of

holders of claims and interests.

**"Confirmation Order"** shall mean the Order of the Bankruptcy Court confirming this Plan and approving the transactions contemplated therein in accordance with § 1129 of the Bankruptcy Code.

**"Creditor"** has the meaning set forth in § 101(10) of the Bankruptcy Code.

**"Debtor"** shall mean Pierson Lakes Homeowners Association, Inc., the debtor and debtor-in-possession in this chapter 11 case.

**"Disallowed Claim"** shall mean any Claim or portion thereof that has been disallowed by an Order of the Bankruptcy Court.

**"Disbursing Agent"** shall mean Goetz Fitzpatrick LLP, chapter 11 counsel for the Debtor.

**"Disclosure Statement"** shall mean the Disclosure Statement filed by the Proponent as required pursuant to Section 1125 et seq. of the Bankruptcy Code.

**"Disputed Claim"** shall mean a Claim (other than an Allowed Claim): (i) listed by the Debtor in its Schedules, as from time to time may be amended in accordance with the Bankruptcy Rules, as disputed, contingent, unliquidated or unknown, or proof of which has been filed with the Bankruptcy Court and an objection to the allowance of which has been or is interposed prior to the final date permitted for the filing of such objection set forth in the Plan, Confirmation Order or such other applicable period of limitation fixed by the Bankruptcy Code or the Bankruptcy Rules, and as to which such dispute or objection has not been determined by a Final Order; and (ii) pursuant to a judgment or order of a court of competent jurisdiction, which judgment or order has been stayed, or as to which judgment or order (or any revision, modification or amendment thereof) the Debtor's time to appeal or seek review or rehearing has

not expired by reason of statute or otherwise; provided, however, that with respect to any Disputed Claim for which a Proof of Claim has not been filed with the Bankruptcy Court in a sum certain amount and that has not been fixed by the Bankruptcy Court at a sum certain, the amount of such Disputed Claim may, for purposes of the Plan, be fixed or liquidated by the Bankruptcy Court prior to the Confirmation Date under § 502(c) of the Bankruptcy Code, or may be fixed by an agreement in writing between the attorneys for the Debtor and the holder thereof, or such Disputed Claims may be fixed or determined by a Final Order entered after the Confirmation Date. All Claims that have not been scheduled by the Debtor as liquidated, noncontingent and undisputed shall constitute Disputed Claims until the final date permitted for filing objections to Claims has passed.

**"Distribute"** or **"Distribution"** shall mean a payment by the Debtor that shall be a payment in full settlement, release and discharge of all rights of the holder of such Claim or Interest, unless otherwise specifically set forth herein.

**"Effective Date"** shall mean ten (10) days after the entry of the Confirmation Order, the date on which the Plan becomes effective. If, however, a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

**"Final Order"** shall mean: (i) an order or a judgment or other decree of the Bankruptcy Court, or (ii) a stipulation or other agreement entered into that is "so ordered" by the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified or amended and as to which order, judgment, stipulation, decree or agreement (or any revision, modification or amendment thereof): (a) any appeal that has been taken has been finally determined or dismissed; or (b) the time to appeal or seek reconsideration has expired by reason of statute or

otherwise and as to which no appeal or petition for review or certiorari or reconsideration has been taken or is pending (or if such appeal or petition has been granted, it has been finally decided), as a result of which such order, judgment, stipulation, decree or agreement (or any revision, modification or amendment thereof) shall have become final in accordance with applicable law.

**"First Loan"** shall mean the non-revolving line of credit with Popular Bank which closed on October 1, 2013 in the principal amount of $650,000.

**"Funds"** shall mean any and all Cash collected from the liquidation or collection of the Debtor's assets including, but not limited to, proceeds from the Causes of Action.

**"GFLLP" or "GF"** shall mean Goetz Fitzpatrick LLP, the Debtor's chapter 11 counsel.

**"Insider"** shall have the meaning set forth in § 101(31) of the Bankruptcy Code, and shall include, but not be limited to, any entity in which an Insider has a direct or indirect equity interest.

**"Interest"** shall mean any rights of shareholders in respect of their equity interest in the Debtor.

**"Lien"** shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

**"Person"** shall mean an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, or a government or any political subdivision thereof or other entity.

**"Petition Date"** shall mean the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case; to wit; March 27, 2018.

**"Plan"** shall mean this Chapter 11 Plan, together with all exhibits hereto, as the same may be amended or modified from time to time.

**"Popular Bank," "PB," or "Lender"** shall mean Popular Bank f/k/a Banco Popular of North America.

**"Post-Confirmation Debtor"** shall mean the Debtor on and after the Confirmation Date.

**"Priority Non-Tax Claim"** shall mean any Claim that is entitled to priority of payment under § 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Expense Claims.

**"Priority Tax Claim"** shall mean any Claim for taxes entitled to priority in payment under §§ 502(i) or 507(a)(8) of the Bankruptcy Code, but specifically excluding any penalty thereon.

**"Professional"** means and refers to all attorneys, accountants, appraisers, consultants, and other professionals retained or to be compensated pursuant to an Order of the Court entered under Sections 327, 328, 330, or 503(b) of the Bankruptcy Code.

**"Professional Fee Claims"** shall mean Administrative Expense Claims made by a Professional.

**"Proof of Claim"** shall mean a Proof of Claim filed with the Clerk of the Court.

**"Pro Rata"** shall mean the proportion that the Allowed Claim bears to the sum of all Allowed Claims, Disputed Claims and undetermined claims of that particular Class on that particular date, unless this Plan provides otherwise.

**"Rejection Claim"** shall mean any Claim that arises from the Debtor's rejection of an executory contract or unexpired lease.

**"Schedules"** shall mean the Debtor's schedules of assets and liabilities, lists and statement of financial affairs and executory contracts filed with the Bankruptcy Court, as may be amended, modified or supplemented from time to time in accordance with Bankruptcy Rule 1009

or orders of the Bankruptcy Court.

"**Second Loan**" shall mean the term loan with Popular Bank dated December 17, 2015 in the principal amount of $250,000.

"**Secured Claim**" means any Claim to the extent reflected in the Schedules or upon a Proof of Claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of a Debtor's interest in the Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code; or (ii) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Unsecured Claim**" shall mean any Claim that is not a Secured Claim, Administrative Expense Claim, Priority Tax Claim or Priority Claim.

"**Unsecured Creditor**" shall mean the holder of an Unsecured Claim.

## ARTICLE II

## CLASSIFICATION

As required by the Bankruptcy Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan. A Proof of Claim or Interest which asserts a Claim or Interest which is properly includable in more than one Class is in a Class to the extent it qualifies within the description of such Class and is in a different Class to the extent it qualifies within the description of such different Class. For purposes of the Plan, all Allowed Claims shall be placed in the following Classes, which Classes shall be mutually exclusive: Class 1, Class 2, Class 3, Class 4 and Class 5.

# ARTICLE III

## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
## PRIORITY TAX CLAIMS AND UNITED STATES TRUSTEE'S FEES

**A.      Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. Therefore, the Debtor has **not** placed the following claims in any class:

### 1.      Administrative Expenses, Involuntary Gap Claims, and Quarterly Fees Due to the Office of the United States Trustee ("UST")

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case that are allowed under § 503(b) of the Bankruptcy Code. Administrative expenses include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition, and compensation for services and reimbursement of expenses awarded by the court under § 330(a) of the Bankruptcy Code. The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. Involuntary gap claims allowed under § 502(f) of the Bankruptcy Code are entitled to the same treatment as administrative expense claims. The Bankruptcy Code also requires that fees owed under section 1930 of title 28, including quarterly and court fees, have been paid or will be paid on the Effective Date of the Plan.

The following chart lists the Debtor's estimated administrative expenses, and quarterly and court fees, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Administrative Expenses (Debtor's Professionals) | $200,000 (estimated) | Paid, in full, on the Effective Date of the Plan, unless the holder of a particular claim has agreed to different treatment |
| Statutory Quarterly Fees to the UST | $_____ | Paid, in full, on the Effective Date of the Plan[2] |

### 2. Priority Tax Claims

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim pursuant to 11 U.S.C. § 511, in regular installments paid over a period not exceeding five (5) years from the order of relief. The Debtor believes that there are no allowed priority claims.

### B. Classes of Claims and Equity Interests

### 1. Classes of Secured Claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim. The Debtor has included two (2) classes of secured claims under the Plan, which are provided for in Class 1 and Class 2. The holders of secured claims are fully secured and their claims will not be bifurcated.

### 2. Classes of Priority Unsecured Claims

The Bankruptcy Code requires that with respect to a class of claims of a kind referred to

---

[2] The Debtor shall continue to pay quarterly statutory fees to the UST until the entry of a final decree and closure of the chapter 11 case.

in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code, each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim, unless a particular claimant agrees to a different treatment or the class agrees to deferred cash payments. There are no classes of priority unsecured claims under the Plan.

3.     **Classes of General Unsecured Claims**

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Bankruptcy Code. There are two (2) classes of general unsecured creditors under the Plan which are provided for in Class 3 and Class 4.

4.     **Classes of Equity Interest Holders**

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. The Debtor is a not-for-profit corporation and does not have any equity holders.

## <u>ARTICLE IV</u>

## <u>CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS</u>

The Plan provides for the division of Claims and Interests into separate Classes, and for the treatment of such Classes as follows:

(a)     **Class 1 - <u>Secured Claim of Popular Bank (First Loan)</u>**

Class 1 consists of the Allowed Secured Claim of Popular Bank on the First Loan in the present principal amount of $225,176.85 (the "Allowed Class 1 Claim"). The Allowed Class 1 Claim shall be paid, inclusive of contract interest set forth in the applicable loan documents, at the rate of $3,472.38 per month. These payments commenced in April 2018 and shall continue after the Effective Date of the Plan on the first day of each consecutive month thereafter until

October 2024.

The holder of the Allowed Class 1 Claim shall retain its lien and security interest in the Debtor's property in accordance with the Final Cash Collateral Agreement [ECF No. 40; *see* Exhibit "B" to the Disclosure Statement]. The Debtor maintains the right to prepay the Allowed Class 1 Claim without prepayment penalty.

Class 1 is unimpaired under the Plan and is not entitled to vote to accept or reject the Plan.

**(b)      Class 2 - <u>Secured Claim of Popular Bank (Second Loan)</u>**

Class 2 consists of the Allowed Secured Claim of Popular Bank on the Second Loan in the present principal amount of $200,880.28 (the "Allowed Class 2 Claim"). The Allowed Class 2 Claim shall be paid in full, inclusive of contract interest set forth in the applicable loan documents, at the rate of $2,626.01 per month. These payments commenced in April 2018 and shall continue after the Effective Date of the Plan on the first day of each consecutive month thereafter until January 2026.

The holder of the Allowed Class 2 Claim shall retain its lien and security interest on the Debtor's property in accordance with the Cash Collateral Agreement [ECF No. 40; *see* Exhibit "B" to the Disclosure Statement]. The Debtor maintains the right to prepay the Allowed Class 2 Claim without prepayment penalty, so long as the funds to be used for such prepayment are generated from assessment(s) to Phase I Homeowners (excepting Lot 12).

Class 2 is unimpaired under the Plan and is not entitled to vote to accept or reject the Plan.

**(c)      Class 3 - <u>General Unsecured Convenience Creditors (Designated Under § 1122(b) of the Bankruptcy Code)</u>**

Class 3 consists of Allowed General Unsecured Convenience Claims. General Unsecured Convenience Claims means Allowed Claims that would otherwise be classified as general unsecured claims but, with respect to each Allowed Claim either (i) the aggregate amount of

16

such claim is less than $2,500.00; or (ii) the aggregate amount of such claim is reduced to $2,500.00 by agreement with holder of such claim.

Each holder of an Allowed Claim in Class 3 shall receive a 100% distribution on the Effective Date of the Plan in full and final satisfaction of their Allowed Claims. Class 3 claims are not entitled to interest on their Allowed Claims as they are being paid, in full, on the Effective Date of the Plan.

Class 3 is unimpaired under the Plan and is not entitled to vote to accept or reject the Plan.

**(d)      Class 4 - <u>General Unsecured Claim of the Sponsors</u>**

Class 4 consists of the Allowed Claim of the Sponsors in an amount not greater than $2,552,744.75 (the "Allowed Class 4 Claim"). The Sponsors shall receive a 100% distribution on the Allowed Class 4 Claim, plus interest at the applicable Federal interest rate in effect as of the Confirmation Hearing[3] or at such other interest rate as is determined by the Court to be fair and reasonable.

The Allowed Class 4 Claim shall be satisfied by giving the Sponsors a credit of $242,650.00, representing the balance of the maintenance credit due to the Sponsors as of the Petition Date (the "Remaining Escrow Fund Credit") from the Petition Date through and including approximately July 2019. The remaining balance of the Allowed Class 4 Claim in an amount not to exceed $2,310,095.00 shall be paid in semi-annual installments commencing six (6) months after the Effective Date of the Plan, for a period of no greater than ten (10) consecutive years (the "Plan Term"), with interest at the Federal rate of interest or at such other interest rate as is determined by the Court to be fair and reasonable (the "Semi-Annual Payments"). The Semi-Annual payments shall come from the proceeds of a special assessment to

---

[3] The present Federal interest rate is 2.00% per annum.

be approved by no less than two thirds (2/3) of the Members and levied against all Lots situated in Phase I (excepting Lot 12 which is owned by the Sponsors) in the aggregate principal amount of no less than $88,850.00 per Lot, plus interest to be amortized and billed semi-annually by the PLHA to the Phase I Lot owners (except Lot 12 owned by the Sponsors), in such amount as is required to pay accrued interest on the Allowed Class 4 Claim over the Plan Term (the "Special Plan Assessment"). The principal balance on the Allowed Class 4 Claim may be prepaid by the Debtor, in whole or in part, during the Plan Term without penalty or premium. The interest due on the Allowed Class 4 Claim over the Plan Term shall be readjusted semi-annually to account for any prepayments made by the Debtor. The first two (2) Semi-Annual Payments due on the Allowed Class 4 Claim shall be in the amount of up to $140,360.56 each. Thereafter, the amount of each remaining Semi-Annual Payment due on the Allowed Class 4 Claim during the Plan Term shall be readjusted annually each year to account for any pre-payments that may be made during the Plan Term.[4]

Class 4 is unimpaired under the Plan and is not entitled to vote to accept or reject the Plan.

**(e)** **Class 5 - <u>Equity Interest Holders</u>**

The Debtor is a New York not-for-profit corporation and does not have any equity interest holders. All present and future Members of the Development shall retain their ownership interest in their respective Lots and shall remain subject to the terms and conditions of the Declaration, the Offering Plan and the By-laws, as each may be amended.

---

[4] In the event the Debtor's objection to the Sponsors' proof of claim is not sustained such that the Allowed Class 4 Claim is greater than $2,552,744.75, the principal amount of the Special Plan Assessment chargeable to each Lot in Phase I of the Development shall be increased to enable the Debtor to make the necessary payments under the Plan. In the event that the Debtor's objection to the Sponsors' proof of claim results in an Allowed Class 4 Claim which is less than $2,552,744.75, the Special Plan Assessment may be reduced proportionally by the PLHA, at the PLHA's sole discretion. The PLHA shall prepare and submit to the holder of the Allowed Class 4 Claim annual schedules reflecting the proposed amortization of the Allowed Class 4 Claim by no later than sixty (60) days before the first Semi-Annual Payments due in each calendar year throughout the Plan Term. All unresolved disputes between the holder of the Allowed Class 4 Claim and the Debtor concerning the amortization schedule(s) shall be determined by further order of the Bankruptcy Court upon application of either party.

# ARTICLE V

## POST CONFIRMATION MANAGEMENT AND MEANS FOR PLAN FUNDING AND SUBSTANTIAL CONSUMMATION OF THE PLAN

### A.    Post-Confirmation Management of the Debtor

The Post-Confirmation management of the Debtor (including officers, directors, managing members, and other Persons in control), and their compensation, shall be as follows and shall continue through and including December 31, 2019 until the next regular election is conducted by the Homeowners in accordance with the provisions of the By-laws:

| Name | Position | Compensation |
|---|---|---|
| Sean Rice | President | No Compensation |
| Dennis Grande | Treasurer | No Compensation |
| Janet Martin | Vice President and Secretary | No Compensation |
| Greg Sarkissian | Sponsors' Representative | No Compensation |

### B.    Means for Implementation of Plan

#### 1.    Source of Plan Payments

All assets and property of the Debtor shall revest in the Post-Confirmation Debtor on the Effective Date of the Plan including, without limitation, all of the Debtor's rights, powers and duties under the Declaration, Offering Plan and the By-laws. Nothing shall be deemed or construed to alter, amend, modify or change the provisions of the Declaration, Offering Plan or the By-laws, except as otherwise expressly provided for herein.

Distributions under the Plan will be funded by the collection of maintenance dues under authorized budgets approved by the Board and by the Special Plan Assessment.

**(a)     Annual Budgets**

Budgets are developed by the Board on an annual basis. Expenses covered under the annual budgets include short-term infrastructure maintenance, security services, property management services, accounting and legal services and long-term infrastructure replacement. In preparing the budget each year, the Board's treasurer recommends those items that will be funded, in whole or in part, from reserves. A majority of the Board must approve the budget.[5]

**(b)     Special Assessments**

In addition to establishing the annual budget, the PLHA may levy, in any assessment year, a special assessment (which must be fixed at a uniform rate for all Lots) applicable to that year only, in an amount no higher than the maximum annual assessment then permitted to be levied for purposes of capital improvements – that is, defraying, in whole or in part, the cost of any construction, unexpected repair or replacement of a described capital improvement, provided that any assessment shall have the consent of two thirds (2/3) of the vote of the Members. The Board shall continue to monitor the capital improvement needs of the Development and exercise its right to levy special assessments in accordance with the By-laws as and when such need arises. There are no special assessments for capital improvements required under the Plan.

Funding of remaining Plan obligations shall be made from the following sources:

(a)     Administrative fee expenses including those owed for the Allowed Claims of Professionals shall be funded by an increase in the budget for the months of January, February, March and April 2019 payable by all Members of the Development. Payments to Professionals shall be made in accordance with orders of the Bankruptcy Court approving such Professional's compensation, after notice and hearing on a Professional's application for allowance of fees and

---

[5] The PLHA is mindful of certain budget item exemptions imposed by the Arbitrator in favor of the Sponsors. Nothing contained in this Plan shall alter the Arbitrator's rulings in this regard.

expenses in accordance with Sections 327, 328 and 330 of the Bankruptcy Code. The anticipated budget increase required for payment of allowed Professional fees is estimated to be approximately $3,000.00 for each of the 74 Lots in the Development.

(b)      Class 1 and Class 2 of the Plan will be paid in the ordinary course of the Debtor's business from regular dues collected from Homeowners.[6] In the event the Debtor elects to prepay the Allowed Claim in either Class 1, Class 2 or both, the funds will come from the proceeds of a special assessment approved by no less than two thirds (2/3) of the Phase I Homeowners and levied against each Lot in Phase I of the Development (except Lot 12 which is owned by the Sponsors).

(c)      Class 3 of the Plan consists of general unsecured convenience claims not exceeding $2,500.00. Each holder of an Allowed Class 3 Claim provided pre-petition work, labor or services that are ordinarily paid from the collection of regular dues. The Debtor estimates that the Allowed Claims in Class 3 of the Plan will not exceed $8,000.00. The Board intends to increase the annual budget for calendar year 2019 in order to generate funds needed to pay all Allowed Claims in Class 3, in full, on the Effective Date of the Plan.

(d)      Class 4 of the Plan shall be paid through the Remaining Escrow Fund Credit and through the Special Plan Assessment.

**The Remaining Escrow Fund Credit**: As part of the Arbitration Award, the Sponsors' regular payment of maintenance was abated until such time that the Sponsors received maintenance credits in the amount of $470,000, plus interest. The Sponsors' Proof of Claim calculates interest on the $470,000 awarded by the Arbitrator from February 2014 (when the PLHA prematurely took the Escrow Fund) through December 31, 2016 (when the Arbitration

---

[6] The Debtor acknowledges that the Sponsor is not responsible for the payment of the First Loan or the Second Loan. Future maintenance bills to be generated to the Sponsors by the Debtor will account for the foregoing exemption.

Awards issued) to be $123,375. Thus, the total maintenance credit due to the Sponsors for the Escrow Fund is $593,375. The Sponsors did not pay their entire share of maintenance to the PLHA from June 1, 2014 through the Petition Date. During this period, the Sponsors owed not less than $350,725 in maintenance dues which they did not pay to the PLHA. Consequently, the Remaining Escrow Fund Credit as of the Petition Date was approximately $242,650, which the Debtor intends to honor under the Plan by giving the Sponsors additional maintenance credits until the Remaining Escrow Fund Credit of $242,650 is fully exhausted. The Debtor estimates that the Sponsors' Remaining Escrow Fund Credit will be fully exhausted in or about July 2019.[7]

If the Special Plan Assessment is not levied by the Board and approved by the Members in Phase I of the Development, the Debtor will likely be forced to dissolve. Section 3 of the Declaration provides that upon dissolution of the PLHA, the common areas of the Development shall be dedicated to an appropriate public agency or utility to be devoted to the purposes as nearly as practical that were required to be devoted to the PLHA. While the Arbitration Awards in favor of the Sponsors were not assessed as a personal liability of any Homeowner in Phase I of the Development, the Board believes that the levy of the Special Plan Assessment is now necessary to avoid dissolution and preserve the integrity of the Development.

The Board intends to seek approval of the Plan, the Special Plan Assessment and the Annual Interest Assessment (as defined below) by a vote of all Homeowners in Phase I of the Development at a special meeting of Homeowners noticed for that purpose. Approval of the Plan

---

[7] It is the Debtor's belief that notwithstanding the Arbitration Award, the Sponsors are not entitled to set off their obligation to pay dues after the Petition Date as a matter of applicable bankruptcy law. The Sponsors have not paid any post-petition dues to the Debtor despite due demand. The Debtor has considered commencing litigation against the Sponsors in order to collect delinquent post- petition dues. However, given the cost of litigation and the time it would take to obtain an order compelling the Sponsors' payment of any post-petition delinquency, the most efficient and economical way to collect this money is to allow the Sponsors to take additional post-petition credits until the Remaining Escrow Fund Credit is fully exhausted. The Sponsors are required to resume paying their proportionate share of dues, as approved by the PLHA when the Remaining Escrow Funds Credit is exhausted. The Debtor reserves all of its rights and remedies against the Sponsors, including without limitation the right to collect maintenance dues which have come due since the Petition Date pending confirmation of the Plan.

and Special Plan Assessment will require the vote of two thirds (2/3) of the Phase I Homeowners.

Upon obtaining the approval from the Phase I Homeowners, the Special Plan Assessment shall be billed to each of the Lots in Phase I of the Development (except Lot 12 owned by the Sponsors). Each Lot in Phase I of the Development (except Lot 12 owned by the Sponsors) shall pay the Special Plan Assessment as follows: (i) the sum of no less than $5,400 per Lot to be received by the PLHA on or before June 1, 2019; (ii) the sum of no less than $5,400 per Lot to be received by the PLHA on or before December 1, 2019; and (iii) additional payment(s) of no less than $740 per month commencing January 1, 2019 and continuing for each consecutive month thereafter until the end of the Plan Term or until the principal balance of the Special Plan Assessment associated with that Lot is paid in full, whichever first occurs. In addition, the Board shall prepare and deliver a separate bill for each Lot in Phase I of the Development settling the amount of annual interest which must be paid to the holder of the Allowed Class 4 Claim during the Plan Term (the "Annual Interest Assessment"). The Annual Interest Assessment billed to each Lot shall be paid to the PLHA, in full, within thirty (30) days of delivery of billing. The Special Plan Assessment and the Annual Interest Assessment paid by each Lot in Phase I shall be deposited into a segregated bank account maintained by the Management Company designated for the payment of the Allowed Class 4 Claim (the "Plan Reserve Account").

To ensure the timely collection and payment of the Allowed Class 4 Claim, the Special Plan Assessment, the Annual Interest Assessment, and the cost of collection thereof shall be a personal obligation of the Person who was the record owner of such Lot in Phase I of the Development (except Lot 12 which is owned by the Sponsors) as of the Effective Date of the Plan. Upon either (i) the closing of title to a future sale of a Lot in Phase I (except Lot 12 owned

by the Sponsors), or (ii) the transfer of record title of a Lot in Phase I from and after the Effective Date for any other purpose (each a "Lot Transfer"), the principal balance of the remaining pro-rata share of the Special Plan Assessment as to that Lot shall be paid, in full, to the Management Company, together with unpaid Annual Interest Assessment due as of the Lot Transfer, if any.

The proceeds collected in connection with a Lot Transfer shall be deposited into the Plan Reserve Account and thereafter, promptly paid by the Management Company to the holder of the Allowed Class 4 Claim. Upon the full payment of the remaining principal balance of the Special Plan Assessment and unpaid Annual Interest Assessment due as of the Lot Transfer, if any, the Lot shall have no further obligation to pay the Special Plan Assessment or any additional Annual Interest Assessment. Each Lot in Phase I may voluntarily prepay its pro-rata share of the Special Plan Assessment independent of a Lot Transfer. All funds held herein Reserve Account shall remain property of the Post-Confirmation Debtor and shall be utilized for the payment of the Allowed Class 4 Claim.

Except as otherwise specifically provided herein, nothing contained herein shall or may be construed to relieve present or future Members of the Development, including the Sponsors, from paying any annual dues, special assessments and fees which may be lawfully imposed by the PLHA. The rights of collection afforded to the PLHA against any Member, including the Sponsors, as provided in the By-laws are incorporated by reference herein and shall apply, in all respects, to the enforcement of Plan obligations imposed upon the Lots in Phase I including the collection of the Special Plan Assessment, the Annual Interest Assessment and any other assessment or budget expenditure arising under the Plan.

The Confirmation Order shall specifically provide that the Sponsors are prohibited from setting off, or attempting to set off, any future maintenance dues that are due to the PLHA

subsequent to exhaustion of the Remaining Escrow Fund Credit. In the event the Sponsors fail to pay any future maintenance due with respect to their Lots within thirty (30) days of billing without first obtaining an order of the Bankruptcy Court or the written consent of the PLHA, the PLHA, in its sole discretion, may credit the amount of unpaid dues owed by the Sponsors, plus interest at the statutory rate in the State of New York, against the Semi-Annual Payments due to the holder of the Allowed Class 4 Claim.

C.      **Substantial Consummation**

The Plan shall be initially deemed substantially consummated upon the Distributions required on the first anniversary of the Effective Date.

## ARTICLE VI

## PREFERENCES AND FRAUDULENT CONVEYANCES

The Debtor has investigated the existence of any transfer by the Debtor that may be avoidable under the various provisions of the Bankruptcy Code, whether as a fraudulent transfer, preference or otherwise (the "Avoidance Actions"). The Debtor does not intend to pursue Avoidance Actions.

## ARTICLE VII

## DETERMINATION OF ALLOWED CLAIMS

Except to the extent that a claim is already allowed pursuant to a final, non-appealable order, the Debtor reserves the right to object to claims.

(a)      **Claims Objection**

An objection to the allowance of a Claim shall be in writing and may be filed with the Bankruptcy Court by the Debtor at any time on or before the Effective Date, or within such other time period as may be fixed by the Bankruptcy Court. Notwithstanding the foregoing, the Debtor

shall file any and all objections to Claims no later than one hundred twenty (120) days after the Effective Date. The Debtor has been made aware of certain creditors whose material claims will be the subject of dispute and/or an objections to claims motion, as follows:

• **Claim No. 3** filed by the IRS in the amount of $10,122.69 – of which $4,486.90 is filed as a priority claim. The Debtor is a not-for-profit entity which is not liable for income taxes at the federal, state or local level. It appears that Claim No. 3 is an estimated claim filed by the taxing authority because of one or more missing tax returns. Once the delinquent return(s) are filed, the Debtor believes that Claim No. 3 should be withdrawn without any liability to the estate.

• **Claim Nos. 8, 9 and 10** filed by the Sponsors, each in the amount of $2,903,469.75. The Sponsors are only entitled to one (1) single claim. Consequently, all but one of these claims should be expunged on the basis that they are duplicative. As to any remaining claim in favor of the Sponsors, it is the Debtor's belief that the amount of the filed claim is overstated. It is the Sponsors' position that their allowed claim totals $2,903,469.75 based upon the following items: (i) $1,484,331.10 (net award to Sponsors from arbitration); (ii) $608,278 (legal fees awarded to Sponsors in arbitration); (iii) $5,113 (Debtor's share of stenographers' fees advanced by Sponsors during Arbitration); (iv) $50,792.57 (50% of Sponsors' fees paid to arbitrator); (v) $161,580.08 (interest claimed by Sponsors between May 26, 2017 to Petition Date) (the "Interest Component"); and (vi) $593,375, representing the Debtor's replenishment of a reserve fund that had been established and funded by the Sponsors pursuant to the 2011 Agreement (the "Escrow Fund"). The Arbitrator held that the PLHA prematurely took $470,000 from the Escrow Fund. The Arbitrator further ruled that the Escrow Fund should be "repaid" to the Sponsors, with interest, by granting the Sponsors a credit against the payment of dues.

The Sponsors' Proof of Claim asserts that they are entitled to $593,375 in maintenance

credits, which includes $123,375 in interest for the period February 1, 2014 through December 31, 2016. The Debtor believes that the Sponsors' Proof of Claim is overstated because the Sponsors did not pay dues to the PLHA from June 1, 2014 to the Petition Date in the amount of $350,725. Thus, because the Sponsors have already taken $350,725 in maintenance credits as of the Petition Date, the remaining credit due to the Sponsors in connection with the Escrow Fund is not greater than $242,650 –in contrast to the $593,375 reflected in the Sponsors' Proof of Claim. Consequently, it is the Debtor's position that the Sponsors' Proof of Claim as filed must be reduced by no less than $350,725.

In addition, the Debtor is investigating whether the Interest Component of the Sponsors' Claim in the amount of $161,580.08 is allowable. In the event the Interest Component is successfully challenged by the PLHA, the Sponsors' Proof of Claim should be further reduced to an amount not greater than $2,391,164.67.

• **Claim No. 11** filed by EONS in the amount of $900,000. This claim was alleged as a "counterclaim" against the PLHA in connection with the EONS Action. The Debtor believes EONS' counterclaim has no basis in law or in fact and was merely alleged in retaliatory fashion. The Debtor further believes that the claim should be expunged in total. The Debtor has submitted the EONS claim against the PLHA to its insurance carrier for coverage under a Director's and Owner's Liability Policy ("D&O"). Coverage under the D&O has been requested by the Debtor for legal fees incurred by the Debtor in defending the EONS counterclaim as well as for any liability on the counterclaim. The Debtor has received preliminary indication that defense of the EONS Action is a covered claim under the D&O.

**(b)** **Amendment of Claims**

A Claim may be amended prior to the Effective Date only as agreed upon by the Debtor

and the holder of such Claim and approved by the Bankruptcy Court, or as otherwise permitted by the Bankruptcy Code and Bankruptcy Rules. After the Effective Date, a Claim may be amended as agreed upon by the holder thereof and the Debtor only to decrease, but not increase, the face amount thereof.

**(c)** **Reserve for Disputed Claims**

The Debtor shall reserve from distribution for the account of each holder of a Disputed Claim that property that would otherwise be distributable to such holder on such date were such Disputed Claim an Allowed Claim on the Effective Date, or such other property as the holder of such Disputed Claim and the Debtor may agree upon. The property so reserved for the holder, to the extent such Disputed Claim is allowed, and only after such Disputed Claim becomes a subsequently Allowed Claim, shall thereafter be distributed to such holder.

**(d)** **Claims Estimation**

The Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim under section 502(c) of the Bankruptcy Code, regardless of whether or not the Debtor has previously objected to such Claim, and the Bankruptcy Court retains jurisdiction to estimate any Claim at any time, including, without limitation, during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount constitutes either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim.

**(e)** **Distributions to Holders of Subsequently Allowed Claims**

Unless another date is agreed on by the Debtor and the holder of a particular

subsequently Allowed Claim, the Debtor shall, within ten (10) days after an Order resolving the Disputed Claim becomes a Final, non-appealable Order, distribute to such holder with respect to such subsequently Allowed Claim that amount, in cash, from the cash held in reserve for such holder and, to the extent such reserve is insufficient, from any other source of cash otherwise available to the Debtor, equal to that amount of cash which would have been distributed to such holder from the Effective Date through such distribution date had such holder's subsequently Allowed Claim been an Allowed Claim on the Effective Date. The holder of a subsequently Allowed Claim shall not be entitled to any additional interest on the Allowed amount of its Claim, beyond what may be provided herein, regardless of when distribution thereon is made to or received by such holder.

**(f)** **Disputes Regarding Rights to Payments or Distributions.**

In the event of any dispute between and among Claimants (including the Person or Persons asserting the right to receive the disputed payment or distribution) as to the right of any Person to receive or retain any payment or distribution to be made to such entity under the Plan, the Debtor may, in lieu of making such payment or distribution to such Person, remit the disputed portion of the Claim into an escrow account or as the interested parties to such dispute may otherwise agree among themselves. Notwithstanding anything to the contrary, the Debtor shall make distributions on account of the undisputed portion of a Claim to such Claimants.

**(g)** **Setoff**

In accordance with the Plan, the Plan enjoins any creditor from asserting any setoff, right of subrogation, or recoupment of any kind, directly or indirectly, against the Debtor or the assets of the Debtor.

**(h)** **Claims Procedures Not Exclusive.**

All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims that have been estimated may subsequently be compromised, settled, withdrawn, or otherwise resolved without further order of the Bankruptcy Court.

Under Bankruptcy Rule 3003(c)(2), any creditor whose Claim had not been scheduled by the Debtor or scheduled as disputed, contingent or unliquidated, and who failed to file a Proof of Claim on or before the Bar Date, will be deemed not to be a creditor with respect to such claim for purposes of voting on and receiving a distribution under the Plan.

The Debtor will be reviewing and analyzing all Claims filed in this proceeding. The Debtor will prosecute motions seeking to reduce, expunge or reclassify certain claims (the "Claims Motions") to conform to the Debtor's books and records or for such other reasons as the Debtor shall state in such motion. The Plan provides that the Bankruptcy Court will retain jurisdiction to hear matters relating to the allowance of Claims.

## ARTICLE VIII

## POST-PETITION POWERS AND RULES

As of the Confirmation Date, under the provisions of §§ 1141(b) and (c) of the Bankruptcy Code, all property, assets and effects of the Debtor shall vest in the Post-Confirmation Debtor free and clear of all Liens, Claims and Interests, except as otherwise expressly provided herein, the Confirmation Order or the Bankruptcy Code.

The Post-Confirmation Debtor shall be authorized and empowered to prosecute, compromise and settle any Avoidance Actions and/or Causes of Action in accordance with the terms and conditions of the Plan and Confirmation Order. Any recoveries or settlement on

account of such Avoidance Actions, shall be transferred to the Reserve Fund for payments to be made in accordance with the Plan and the Bankruptcy Code.

The Post-Confirmation Debtor shall have the authority to prosecute objections to Claims using the Debtor's retained Professionals except in the case of any conflict, in which case any retention of counsel in order to prosecute the Avoidance Actions or objections to Claims shall be subject to the approval of the Bankruptcy Court. The Plan shall not become effective unless and until the Confirmation Order, in form and substance acceptable to the Debtor, shall have been signed by the judge presiding over the Bankruptcy Case, and there shall not be a stay or injunction in effect with respect thereto.

In the event that the foregoing conditions specified do not occur, (i) no Distributions under the Plan shall be made, (ii) the Debtor and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtor's obligations as to Claims and Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor. The Confirmation Order shall, among other things:

    (a)    authorize the Post-Confirmation Debtor to perform the Plan according to its terms; and

    (b)    authorize the Management Company/Debtor to administer the Reserve Fund and perform all other duties authorized under the Plan.

From and after the Confirmation Date, the Post-Confirmation Debtor shall consult with the Management Company as provided for herein, for the purpose of administering this Plan. The Management Company/Debtor will establish the Reserve Fund in the manner provided herein.

Until a final decree shall have been entered, the Debtor shall timely pay post-confirmation quarterly fees to the United States Trustee based on disbursements made by the Management Company from Funds in the Reserve Fund and/or any other disbursements made on behalf of the Post-Confirmation Debtor.

## ARTICLE IX

## EXECUTORY CONTRACTS AND LEASES

Any executory contract or unexpired lease of the Debtor that has not expressly been rejected by motion, or is not the subject of a pending application to assume on the Confirmation Date, shall be deemed rejected by the Debtor on the Effective Date. Rejection Claims must be filed within thirty (30) days of the entry of the Confirmation Order. Failure to timely file a Rejection Claim will result in no distribution.

Any entity with a Claim that arises from the rejection of an executory contract or an unexpired lease shall have the same rights as a general unsecured creditor (Class 9) to the extent such Claim becomes an Allowed Unsecured Claim. The Debtor does not believe that there are any executory contracts and/or leases that will be rejected.

The Debtor does not anticipate that there will be significant claims arising from the rejection of any existing executory contract or lease.

## ARTICLE X

## INCOME TAX CONSEQUENCES TO CLAIMANTS

There may be significant tax ramifications affecting Claimants as a result of their treatment under the Plan. The Debtor has not performed an analysis or review of such ramifications. All creditors are urged to consult with their own tax advisors as to the tax consequences of the Plan to them under Federal and applicable state and local laws.

# ARTICLE XI

# RETENTION OF JURISDICTION

Under the Plan, the Bankruptcy Court shall retain jurisdiction herein under chapter 11 of the Bankruptcy Code for the purposes set forth in § 1127(b) of the Bankruptcy Code, including, *inter alia*, the following matters:

(a) to enable the Debtor to prosecute all proceedings commenced prior to the entry of the Confirmation Order and, thereafter, to set aside liens or encumbrances and to recover any preferences, transfers, assets or damages to which the Debtor may be entitled under the Bankruptcy Code or other Federal, state or local law, if any;

(b) to hear and determine any Avoidance Actions and all motions concerning the classification, allowance or disallowance of any Claim;

(c) to resolve any disputes concerning any reserve established for Disputed Claims or the administration thereof;

(d) to hear and determine all Claims relating to a security or ownership interest in any property of the Debtor or in any proceeds thereof;

(e) to hear and determine all Claims arising out of any agreement entered into by the Debtor after the Petition Date;

(f) to recover all assets and properties of the Debtor, wherever located, except to the extent limited in prior orders of this Court;

(g) to alter, modify and amend the Plan under § 1127 of the Bankruptcy Code or to remedy any defect, cure any omissions, or reconcile any inconsistency herein or Confirmation Order as may be necessary or advisable to carry out the purpose and intent of the Plan and to the extent authorized by the Bankruptcy Code or Bankruptcy Rules;

(h) to hear and determine such other matters as may be provided for in the Order of the Bankruptcy Court confirming the Plan and for the purposes set forth in § 1127(b) and § 1142 of the Bankruptcy Code or in Bankruptcy Rules 1019 and 3020(d);

(i) to hear and determine all applications for compensation of professionals for services rendered and expenses incurred up through the Confirmation Date and thereafter;

(j) to hear and determine any and all pending applications, adversary proceedings, contested matters and litigated matters;

(k) to make such orders *ex parte* or upon application as are necessary or appropriate to carry out the provisions of the Plan, including orders interpreting the provisions thereof;

(l) to enter a Final Order or decree concluding the Debtor's chapter 11 Case; and

(m) to determine such other matters as may be provided for in the Confirmation Order as may be authorized under the provisions of the Bankruptcy Code.

## ARTICLE XII

## MECHANICS OF HOW THE PLAN MAY BE ACCEPTED OR REJECTED

For the Plan to be confirmed, various statutory conditions must be satisfied, including: (i) the acceptance of the Plan by at least one impaired class entitled to vote; (ii) the provision for payment or distribution to each claimant of money and/or property greater than or equal in value to what claimants would have received in liquidation; (iii) a finding by the Court that the Plan is feasible; and (iv) with respect to each class, either the acceptance by that class or a finding by the Court that the plan is "fair and equitable" with respect to, and "does not discriminate unfairly" against, that class.

Section 1129 of the Bankruptcy Code permits confirmation of the Plan even if the Plan is

not accepted by all impaired classes so long as, among other things, at least one impaired class has accepted the Plan. In addition, every non-accepting holder of a Claim or Interest of an impaired class must receive or retain property with a value not less than would be received in a liquidation, the Plan must not discriminate unfairly, and the Plan must be fair and equitable with respect to each non-accepting impaired class.

Under the Bankruptcy Code, a Claimant is entitled to vote on a plan of reorganization only if either: (i) its claim has been scheduled by the Debtor and is not scheduled as disputed, contingent or liquidated, or (ii) it has filed a Proof of Claim on or before the Bar Date set by the Court. A Claimant's vote may be disregarded if a court determines that the claimant's acceptance or rejection of the plan was not solicited or procured in accordance with the provisions of the Bankruptcy Code.

Only holders of Claims and Interests that are impaired under the Plan are entitled to vote on the acceptance or rejection of the Plan. Generally, § 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless a plan does not alter the legal, equitable and contractual rights of the holder of each claim or interest in the Class. Simultaneously with the circulation of this Disclosure Statement and accompanying Plan, the Debtor has transmitted the Ballot for the purposes of voting.

**As a reminder to all creditors entitled to vote and interested in voting, all Ballots must be received by Debtor's counsel, Goetz Fitzpatrick LLP, Attention: Gary M. Kushner, Esq., on or before the date set forth above for the purposes of voting. If you did not receive a Ballot with this Statement, the Debtor believes you are not eligible to vote on the Plan. If, however, you believe you are entitled to vote, you must contact the undersigned counsel to obtain a Ballot.**

# ARTICLE XIII

## ALTERNATIVES TO THE PLAN

The Debtor believes that acceptance of the Plan is in the best interest of the Debtor and its creditors and affords creditors the greatest opportunity for the realization of value from the assets of the Debtor.

One alternative to the Plan is liquidation of the Debtor's remaining assets under the provisions of Chapter 7 of the Bankruptcy Code. The Debtor has considered whether its creditors would receive more upon a liquidation of the Debtor under Chapter 7 than under the Plan. The Debtor has concluded that a liquidation under Chapter 7 would yield the same or a lesser dividend, and would substantially delay distribution to Claimants.

Upon liquidation under Chapter 7, additional liabilities would be incurred, which would include the commissions, costs and expenses of a Chapter 7 trustee, as well as fees and expenses of a trustee's accountants, attorneys and any other professionals retained by the trustee. Moreover, these additional liabilities would enjoy a priority over all other Allowed Claims.

Under the Plan, however, the Debtor will make Distributions to creditors from future earnings and sales of its assets. Further, the Debtor will be responsible for pursuing asset recoveries and reviewing and resolving all objections to Claims. Consequently, the estate will benefit by eliminating the costs of trustee commissions and the time and expense of a trustee's newly-retained counsel and accountants familiarizing themselves with this case. Further, upon confirmation of this case, the Debtor will have the benefit of utilizing the Debtor's existing retained professionals, which will expedite the administration of the estate.

The Debtor has concluded that with respect to each class of Claims designated herein, each holder of a Claim or Interest in such class will receive or retain under the Plan, on account of the

Claim or Interest, a value as of the Effective Date that is equal to or greater than the amount that the holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. The Debtor's Balance Sheet of Assets and Liabilities is annexed to the Disclosure Statement as Exhibit "C."

## ARTICLE XIV

## PROCEDURE FOR RESOLVING DISPUTED CLAIMS

In the event that objections to Claims shall be filed by the Post-Confirmation Debtor, the Disbursing Agent shall pay the undisputed portion of such Disputed Claims, if any, and thereafter determine the amount of Cash to be reserved with respect to the Disputed Claims in a sum not less than the amount required to pay the remaining Claim in full, and pay the initial Distribution payment under the Plan on account of such Disputed Unsecured Claims as if those Disputed Unsecured Claims were proved and allowed, in full (without interest), and deposit same in the Reserve Fund that shall be maintained by the Disbursing Agent in a separate FDIC interest-bearing bank or money-market account of the Disbursing Agent's choice.

If the Disbursing Agent shall have made a subsequent Distribution to Unsecured Claimants, then the Disbursing Agent shall also deposit into the Reserve Fund, the p*ro rata* share of such subsequent Distribution on account of the remaining Disputed Unsecured Claims as if such Disputed Unsecured Claims shall have been allowed in full. Disputed Claims that become Allowed Claims shall be satisfied from the Reserve Fund. Should the Reserve Fund exceed the amount such Disputed Claim or Claims would have received pursuant to the Unsecured Creditor Distribution and any subsequent Distribution and interest thereon, any excess will be transferred to the Distribution Fund. The Reserve Fund shall be specifically marked for the benefit of holders of Disputed Claims and said funds shall not be subject to attachment, levy, seizure,

sequestration or other remedies by any creditor in aid of enforcement of a judgment Claim.

Objections to Claims, to the extent not already commenced by the Debtor, shall be filed by the Post-Confirmation Debtor with the Bankruptcy Court and served upon the holder of each Claim to which objections are made, not later than one hundred eighty (180) days subsequent to the Effective Date or within such other time period as may be fixed by the Bankruptcy Court, **provided, however**, that for cause shown, the Bankruptcy Court may without notice or a hearing extend such time upon request of the Post-Confirmation Debtor.

## ARTICLE XV

## UNCLAIMED DISTRIBUTIONS

For a period of one hundred twenty (120) days following a Distribution Date, the funds representing unclaimed Distributions shall be held by the Disbursing Agent for the benefit of holders of Allowed Claims that have failed to claim such Distribution. For a period of one hundred twenty (120) days following a Distribution Date, unclaimed property due to the holder of an Allowed Claim shall be released by the Disbursing Agent and delivered to such holder upon presentation and proper proof by such holder of its entitlement thereto.

At the end of one hundred twenty (120) days following the initial Distribution Date, all unclaimed Distributions, together with the interest thereon, shall revert to the Distribution Fund. If two successive distributions remain unclaimed by a particular Claimant, and after reasonable attempt to locate a correct address for the Claimant, the Disbursing Agent may remove such Claimant from the Distribution list for all future Distributions.

## ARTICLE XVI

## RELEASES

Except (i) as otherwise provided herein or (ii) in any Final Order entered by the Bankruptcy Court, all Persons who have held, hold, or may hold Claims against or Interests in

38

the Debtor that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from the commencement or continuation of any action, or the employment of process, from taking any act to collect, enforce, attach, recover or offset against such Claim, and from taking any act to create, perfect or enforce any lien or encumbrance against property of the Debtor's estate that is to be transferred to the Post-Confirmation Debtor or distributed to creditors under the Plan.

Neither the Debtor nor its representatives and agents, nor any of the professional Persons employed by it, shall have or incur any liability to any entity for any action taken or omitted in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted in connection with the chapter 11 case or the Plan, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts.

As provided herein, all payments, distributions and transfers of cash or property under the Plan are in full and final satisfaction, settlement and release of all claims against the Debtor and its estate of any nature whatsoever existing at the Confirmation Date.

Except as otherwise provided herein, nothing contained herein shall be deemed a release, satisfaction or waiver of the Debtor's or any Member's rights or remedies, both monetary or non-monetary, under the Declaration, Offering Plan, the By-laws or under applicable New York State Law.

## ARTICLE XVII

## MISCELLANEOUS PROVISIONS

(a)     Under §§ 105, 1041, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of confirmation directing the implementation of matters or actions required by the Plan.

(b)     In connection with the Plan, the Debtor and, where applicable, the Management Company, shall comply with all withholding and reporting requirements imposed by Federal, state and local taxing authorities, and distributions under the Plan shall be subject to such withholding and reporting requirements; **provided, however**, that the transfer of any Cash, property or other interest hereunder shall not be subject to any Federal, state or local tax to the fullest extent provided under § 1146 of the Bankruptcy Code.

(c)     Each and every Creditor that accepts the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided herein and that there are no outstanding liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

(d)     The Plan may be altered, amended or modified by the Debtor in a writing, signed by the Debtor, at any time before the substantial consummation of the Plan, as provided in §§ 1101(a) and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. The Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained herein shall (i) constitute a waiver or release of any Claims by or against, or

any Interest in, the Debtor; or (ii) prejudice in any manner the rights of the Debtor or any other party in any further proceedings involving the Debtor or its estate.

(e)     The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

(f)     All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein:

(i)     if to the Debtor, at Goetz Fitzpatrick LLP, One Penn Plaza, 31st Floor, New York, NY 10119, Attn: Gary M. Kushner, Esq.;

(ii)     if to any Creditor or Interest holder at (a) the address set forth on the respective Proof of Claim or Proof of Interest filed by such creditor or holder; (b) the address set forth in any written notices of address changes delivered to the Management Company after the date of any related Proof of Claim; or (c) the address reflected in the Schedules if no Proof of Claim or Proof of Interest is filed and the Management Company has not received a written notice of a change of address; and

(iii)     if to any Entity that has filed a notice of appearance, at the address set forth on such notice of appearance.

(g)     Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law is applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflict of laws thereof.

(h)     Nothing contained herein shall prevent the Debtor or Creditors from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for with herein.

(i)     If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other

provision of this Plan.

(j)     The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

# ARTICLE XVIII

## DEFAULT

The following shall constitute an event of default (each a "Default").

(a)     Failure of the Debtor to make the cash distributions required under the Plan to any and all creditors within thirty (30) days of when payment became due which failure shall remain uncured for a period of thirty (30) days after notice and an opportunity to cure; and/or

(b)     Failure of the Debtor to comply with any of the non-monetary covenants or obligations contained herein, which failure shall remain uncured for a period of thirty (30) days after notice and an opportunity to cure.

Upon a Default, any creditor may seek relief from the Bankruptcy Court to enforce its remedies, including, without limitation, the right to seek conversion of the case to chapter 7.

Dated: August 9, 2018
New York, New York

Goetz Fitzpatrick LLP
***Attorneys for Debtor***

By:    <u>/s/Gary M. Kushner</u>
Gary M. Kushner
A Partner of the Firm
Scott D. Simon
One Penn Plaza, 31st Floor
New York, New York 10119
(212) 695-8100


<u>/s/Sean Rice</u>
Sean Rice (in his capacity of President
of the Board of Directors of the Pierson Lakes
Homeowners Association, Inc.)